[Cite as *Shoenfelt v. Shoenfelt*, 2013-Ohio-1500.]

## IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## SHELBY COUNTY

ROBERT M. SHOENFELT,

    PLAINTIFF-APPELLANT/
    CROSS-APPELLEE,               CASE NO. 17-12-08

    v.

JENNIFER L. SHOENFELT,         O P I N I O N

    DEFENDANT-APPELLEE/
    CROSS-APPELLANT.

Appeal from Shelby County Common Pleas Court
Domestic Relations Division
Trial Court No. 10-DV-000027

Judgment Reversed and Cause Remanded

Date of Decision:    April 15, 2013

APPEARANCES:

    *Timothy S. Sell and Breann M. Zickafoose* for
        Appellant/Cross-Appellee

    *Robert M. Harrelson and William M. Harrelson* for
        Appellee/Cross-Appellant

**ROGERS, J.**

{¶1} Plaintiff-Appellant/Cross-Appellee, Robert Shoenfelt ("Robert"), appeals the judgment of the Court of Common Pleas of Shelby County, Domestic Relations Division, granting a decree of divorce. On appeal, Robert argues that the trial court erred by: (1) setting the de facto date of the marriage's termination as December 2009; (2) failing to order Defendant-Appellee/Cross-Appellant, Jennifer Shoenfelt ("Jennifer"), to reimburse Robert for his payment of marital debts between the de facto termination date of the marriage and the date of the final hearing; (3) determining that Jennifer's medical school loans were marital debts; (4) determining that Robert's unvested deferred compensation assets were marital; and (5) denying Robert's request that Jennifer pay half the costs for transcribing the proceedings. In her cross-appeal, Jennifer contends that the trial court erred in determining that certain payments by Robert's brother and friend were marital debts and in admitting Robert's listing of the marital assets and debts. For the reasons that follow, we reverse the trial court's judgment.

{¶2} Robert and Jennifer were married on May 2, 1987. Their marriage produced two children. When Robert filed his complaint for divorce on February 12, 2010,[1] one of the children was still a minor while the other was already

---

[1] Jennifer also counterclaimed for divorce.

emancipated. During the pendency of these proceedings, the couple's minor child reached majority age.

{¶3} The final hearing occurred on March 13, 2010, March 15, 2010, and March 16, 2010. The following relevant evidence was adduced at the hearing. Jennifer left the marital residence in November 2006 after Robert discovered that she was having an extramarital affair with his cousin. At that time, Jennifer moved all of her possessions into another apartment. Additionally, Robert retained counsel to address the possible dissolution of the marriage and discussed dissolution with Jennifer around the time that she left.

{¶4} After Jennifer's relocation, the parties attempted to reconcile during the early part of 2007. The couple had sexual relations on a couple of occasions and attended three counseling sessions in February and March of 2007, but Robert decided to discontinue them. Further, Jennifer stayed at the parties' marital residence for a couple of days in March 2007 to care for the couple's minor child while Robert was out-of-town. During this overnight stay, Robert and Jennifer discussed the possibility of a full reconciliation, but Robert foreclosed the possibility. They made no further reconciliation attempts after March 2007. Indeed, Robert testified that his counsel sent a letter to Jennifer in January 2009 that suggested the dissolution of the marriage.

{¶5} In regard to the couple's finances after November 2006, Robert and Jennifer used different bank accounts. Upon Jennifer's relocation from the marital residence, she stopped using the couple's joint account with US Bank. Instead, Jennifer used the couple's Minster bank account and a Chase bank account that was solely in her name. Initially, Robert used the couple's US Bank account before he opened another bank account in his sole name. Both parties had their respective salaries directly deposited into their separate accounts and used their salaries to cover their respective living expenses. After November 2006, Robert used the US Bank joint account to pay Jennifer's car payment, but she reimbursed him every month from her separate money. Further, from November 2006 through 2010, Jennifer deposited money into Robert's account several times to cover some of the expenses relating to the care of their children.

{¶6} Both Robert and Jennifer indicated that they made significant decisions without consulting each other after November 2006. Most notably, Jennifer purchased a home in December 2008. Jennifer offered the following testimony regarding her decision:

> Q:     When you purchased your home in December of 2008, did you discuss with [Robert] the house that you were gonna purchase?
>
> A:     Yes, actually I did tell him that I was thinking about buying a home and –
>
> Q:     You told him you were thinking about buying a home. Did – did you seek his input into which house you were buying?

A:     Why would I do that?

Q:     That's why I'm asking.  Did you?

A:     No.

Q:     So [Robert] had no input into the location of the home?

A:     No.

Q:     Had no input into the – the home that you purchased?

A:     No.

Q:     Had no input into the type of financing you secured for the home?

A:     No.  Hearing Tr., p. 466-67.

{¶7} At the hearing, both parties advocated for the dates that they wanted the trial court to adopt as the termination date of the marriage.  As a result, the parties admitted joint exhibits showing asset and debt valuations as of November 2006, which was Robert's proposed termination date, and as of December 2009, which was Jennifer's proposed termination date.  In regard to her selection of the December 2009 date, Jennifer testified as follows:

Q:     Do you remember why the [December 2009] date was used for purposes of seeking values?

A:     I believe it was arbitrarily selected by all of us as a potential date, just different than November 2006 * * *.  Hearing Tr., p. 433.

Jennifer further elaborated as follows regarding the December 2009 proposed date:

Q:    And as you indicated yesterday, this was an arbitrary date that – that was picked, is that correct?

A:    By all four of us in a pretrial hearing.

Q:    Well, I can – are you suggesting that [Robert] and I took the position that this marriage ended in December of 2009?

A:    I'm suggesting that when we discussed the situation as to how we would pick what other date, other than November [2006], would be an attempt to divide assets and liabilities, both of you agreed, all four of us agreed together, in a pretrial hearing, okay let's – let's throw some dates around, which we did. And we all came to the conclusion that for the sake of simplicity, we would have to find another date, and we agreed on December, 2009, because there were some definite shifts as how things were handled financially after that point or that point in time.

Q:    All right. So you're – you're backing off of your statement that was an arbitrary date as selected from your testimony from yesterday?

A:    No, I just endorsed that right now. Hearing Tr., p. 490-91.

{¶8} After the hearing, both Robert and Jennifer filed their proposed findings of fact and conclusions of law, in which both advocated for their proposed termination dates. The magistrate issued his decision on June 6, 2011. He framed the issue regarding the termination date as "whether equity requires this court to select the earlier date of November [2006], as requested by [Robert], or the later date of December, 2009, as requested by Jennifer." (Docket No. 94, p. 6). The magistrate resolved this issue in favor of Jennifer and selected December

2009 as the termination date of the marriage. His reasoning for this selection was as follows:

> The Court should find that the marriage of the parties ended in December, 2009, the proposed date which is closer to the date of the final hearing. The Court may also wish to consider the December, 2009, date as a more reliable de facto date of termination of the marriage. The December, 2009, date is more closely associated with the date when [Robert] filed his Complaint for divorce, and when the parties both realized that divorce proceedings were imminent." (Docket No. 94, p. 8).

{¶9} Robert objected to the magistrate's decision on June 17, 2011 on a variety of grounds, including the magistrate's selection of December 2009 as the termination date of the marriage. He also requested the transcription of the hearing before the magistrate. Jennifer likewise objected to the magistrate's decision on a variety of grounds. Her objections, along with a request for a hearing transcript, were filed on June 20, 2011. On December 6, 2011, Robert filed a motion for the parties to share the expense of the hearing transcript's production. The trial court denied Robert's motion on the grounds that this cost was "a litigation expense, for which each party bears their own expenditures." (Docket No. 133).

{¶10} On December 19, 2011, the trial court overruled Robert's objection regarding the magistrate's selection of December 2009 as the termination date of the marriage. The trial court's decision included the following explanation:

> In a thoughtful and comprehensive conclusion, the Magistrate adopted the December 2009 date as the termination date of the marriage. The Court would note the transcript supports the factual findings of the Magistrate and this Court would independently agree with the conclusion reached by the Magistrate.
> The Court would find using the final hearing date in this case is inequitable and would adopt and use the December 2009 date as the date of the defacto [sic] termination of the marriage and use this date for the distribution and valuation of assets and liabilities as those amounts were provided to the Court. (Docket No. 133, p. 2).

The trial court issued a decree of divorce on February 21, 2012. The decree uses December 2009 as the termination date of the marriage and it distributes the marital assets and debts based on that date. The trial court also ordered that the parties share the costs of this action.

{¶11} It is from this judgment that both Robert and Jennifer appeal, presenting the following assignments and cross-assignments of error for our review.

*Robert's Assignment of Error No. I*

**THE TRIAL COURT ABUSED ITS DISCRETION IN DETERMINING DECEMBER OF 2009 AS THE DE FACTO DATE OF TERMINATION OF THE MARRIAGE.**

*Robert's Assignment of Error No. II*

**THE TRIAL COURT ABUSED ITS DISCRETION IN DETERMINING THAT APPELLEE WAS NOT RESPONSIBLE FOR REIMBURSEMENT TO APPELLANT FOR THE MARITAL DEBTS PAID BY APPELLANT FROM THE DE FACTO DATE OF TERMINATION OF THE MARRIAGE UNTIL THE DATE OF THE FINAL HEARING.**

*Robert's Assignment of Error No. III*

**THE TRIAL COURT ABUSED ITS DISCRETION IN DETERMINING THAT APPELLEE'S MEDICAL SCHOOL LOANS WERE MARITAL DEBTS.**

*Robert's Assignment of Error No. IV*

**THE TRIAL COURT ABUSED ITS DISCRETION IN DETERMINING THAT APPELLANT'S UNVESTED DEFERRED COMPENSATION ASSETS WERE MARITAL ASSETS.**

*Robert's Assignment of Error No. V*

**THE TRIAL COURT ABUSED ITS DISCRETION IN DETERMINING THAT APPELLANT IS NOT RESPONSIBLE FOR ONE HALF OF THE COSTS OF TRANSCRIPTION.**

*Jennifer's Cross-Assignment of Error No. I*

**THE TRIAL COURT ABUSED ITS DISCRETION IN DETERMINING THAT THE TWO PAYMENTS, TOTALING $70,000, FROM APPELLANT-PLAINTIFF'S BROTHER AND APPELLANT-PLAINTIFF'S FRIEND WERE MARITAL DEBTS TO BE EVENLY DIVIDED.**

*Jennifer's Cross-Assignment of Error No. II*

**THE TRIAL COURT ABUSED ITS DISCRETION IN ADMITTING APPELLANT-PLAINTIFF'S EXHIBITS 1 AND 1A THROUGH 48 AND 48A WHEN SUCH ADMISSION MATERIALLY PREJUDICED JENNIFER BECAUSE THEY DID NOT FAIRLY REPRESENT THE ALLEGED MARITAL DEBTS.**

{¶12} Due to the nature of the assignments of error, we elect to address Robert's second, third, and fourth assignments of error, as well as both of Jennifer's cross-assignments of error, together.

*Robert's First Assignment of Error*

{¶13} In his first assignment of error, Robert argues that the trial court improperly set December 2009 as the de facto termination date of the marriage. We agree.

*Standard of Review*

{¶14} A trial court's setting of a de facto termination date is reviewed for an abuse of discretion. *Eggeman v. Eggeman*, 3d Dist. No. 2-04-06, 2004-Ohio-6050, ¶ 9. A trial court will be found to have abused its discretion when its decision is contrary to law, unreasonable, not supported by the evidence, or grossly unsound. *See State v. Boles*, 2d Dist. No. 23037, 2010-Ohio-278, ¶ 17-18, citing *Black's Law Dictionary* 11 (8th Ed.2004). When applying the abuse of discretion standard, a reviewing court may not simply substitute its judgment for that of the trial court. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

*De Facto Termination Dates Under R.C. 3105.171(A)(2)*

{¶15} R.C. 3105.171(A)(2) governs the setting of a marriage's termination date and it provides, in pertinent part, as follows:

> (2) "During the marriage" means whichever of the following is applicable:

(a)   Except as provided in division (A)(2)(b) of this section, the period of time from the date of the marriage through the date of the final hearing in an action for divorce * * *;

(b)   If the court determines that the use of either or both of the dates specified in division (A)(2)(a) of this section would be inequitable, the court may select dates that it considers equitable in determining marital property.

Under the plain terms of the statute, the final hearing date is the presumptive termination date of the marriage. *Bowen v. Bowen*, 132 Ohio App.3d 616, 630 (9th Dist. 1999). But, if using the final hearing date would be inequitable, a trial court can vary from this presumption and select an alternative termination date that is more equitable. *Fisher v. Fisher*, 3d Dist. No. 7-01-12 (Mar. 22, 2002). Although the decision to select an alternative termination date rests within the sound discretion of the trial court, *id.*, its discretion is not unlimited, *see Berish v. Berish*, 69 Ohio St.2d 318, 321 (1982) (stating that a trial court is authorized to use a de facto termination date under R.C. 3105.171(A)(2) provided that it is "reasonable under the facts and circumstances presented in a particular case"); *Boggs v. Boggs*, 5th Dist. No. 07 CAF 02 0014, 2008-Ohio-1411, ¶ 66 (stating that varying the presumed termination date is only appropriate where the evidence "clearly and bilaterally shows that it is appropriate based on the totality of the circumstances").

{¶16} In *Dill v. Dill*, 179 Ohio App.3d 14, 2008-Ohio-5310 (3d Dist.), we stated that trial courts should consider the following non-exhaustive list of factors when setting de facto termination dates:

(1)  Whether the parties separated on bad terms;

(2)  Whether the parties believed the marriage had ended before the hearing;

(3)  Whether the parties cohabitated with others during the separation;

(4)  The parties' degree of involvement during the separation;

(5)  Whether the parties lived as husband and wife;

(6)  Whether the parties maintained separate residences;

(7)  Whether the parties utilized different bank accounts;

(8)  Whether the parties attempted to reconcile;

(9)  Whether the parties retained counsel; and

(10) Whether the parties vacationed separately or attended social functions together.  *Id*. at ¶ 11.

We further noted that "[n]o one factor is dispositive; rather the trial court must determine the relative equities on a case-by-case basis." *Id*.

{¶17} Our decision in *Dill* addressed a factual context in which the parties had been separated for approximately ten years before the final hearing date. Despite this extended period of time, the trial court set the final hearing date as the termination date of the marriage.  We found that this decision was an abuse of

discretion and consequently remanded the matter for the trial court to determine an equitable de facto termination date based on the above factors. *Id*. at ¶ 47.

*The Trial Court's De Facto Termination Date*

**{¶18}** Here, a review of the trial court's order regarding the de facto termination date of the marriage reveals two flaws. First, the magistrate framed the issue as "whether equity requires this court to select the earlier date of November [2006] as requested by [Robert], or the later date of December, 2009, as requested by Jennifer." (Docket No. 94, p. 6). Second, the magistrate selected the December 2009 date for three reasons: (1) it was closer to the date of the final hearing; (2) it was closer to the date that Robert filed his complaint; and (3) it was the date when the parties realized that divorce was imminent. Both of these flaws render the trial court's decision an abuse of discretion.

**{¶19}** The issue before the trial court was not which of the dates suggested by the parties was an appropriate de facto termination date. Rather, R.C. 3105.171(A)(2) requires that the trial court engage in a two-part analysis. First, it must consider whether using the final hearing date as the termination date of the marriage would be equitable. Second, if using the final hearing date would be inequitable, it must determine, based on the *Dill* factors, a previous date that is both equitable to the parties and reasonable based on the evidence adduced at trial. *Berish*, 69 Ohio St.2d at 321; *Dill*, 179 Ohio App.3d 14, 2008-Ohio-5310, at ¶ 47;

*Boggs*, 2008-Ohio-3411, at ¶ 66. When engaging in this analysis, the trial court is not constrained by the self-serving suggested dates of the parties. *E.g.*, *Wei v. Shen*, 12th Dist. No. CA2002-12-300 (Nov. 24, 2003) (affirming trial court's decision to not use agreed termination date proposed by the parties because evidence adduced at trial did not support the agreed upon date).

**{¶20}** The trial court properly engaged in the first step of this analysis. However, it failed to appropriately handle the second step because its reasoning for the December 2009 date is not in accord with our decision in *Dill* or appropriate considerations of equity. In *Dill*, we did not list the temporal proximity of the final hearing date and the date of the complaint's filing as factors that trial courts should consider when setting a de facto termination date. And, indeed, we see little reason why equity requires that such factors be considered. R.C. 3105.171(A)(2)(b) is concerned with the selection of a de facto termination date that appropriately reflects when the parties' marriage was effectively over. *See Mantle v. Sherry*, 10th Dist. No. 02AP-286, 2003-Ohio-6058, ¶ 11 (stating that trial courts should "look at the actual nature of the parties' relationship" when setting a de facto termination date); *Harris v. Harris*, 11th Dist. No. 2002-A-81, 2003-Ohio-5350, ¶ 11 (noting that trial courts generally set de facto termination dates where "the parties separate, make no attempt at reconciliation, continually maintain separate residences and/or separate bank accounts"). It is not concerned

with ensuring that trial courts select de facto termination dates that are closer to the presumed date contained in R.C. 3105.171(A)(2)(a) or the date of the complaint's filing.

{¶21} The trial court's reliance on Robert's and Jennifer's alleged belief that divorce proceedings were imminent in December 2009 is also inappropriate. First, such a finding that this belief developed in December 2009 is not supported by the record. Jennifer testified that she was aware that Robert had retained legal counsel in November 2006 and both parties testified that they had conversations about dissolution at that time. The parties also indicated that Robert's legal counsel sent correspondence to Jennifer in January 2009 that suggested dissolution. In light of this evidence, we are unable to agree with the trial court's finding that the parties did not first realize the dissolution of the marriage was imminent until December 2009. Even if the trial court's fact finding in this regard was supported by the record, it is still immaterial to the ultimate decision of when to set the termination date under *Dill*.

{¶22} In addition to improperly relying on the above factors, the trial court failed to account for a variety of facts that suggested the de facto termination date of the marriage was before December 2009. The evidence adduced at trial established that the parties had maintained separate residences since November 2006. Although Robert and Jennifer tried to reconcile in early 2007, they made no

attempts after March 2007. Further, since November 2006, Robert and Jennifer have used separate bank accounts and they have only shared expenses relating to the care of their children. They have vacationed separately and they have made significant life decisions without consulting each other. Indeed, when asked why she did not consult Robert before purchasing her house in December 2008, Jennifer responded, "Why would I do that?" Hearing Tr., p. 466. Finally, Jennifer herself characterized the December 2009 date as "arbitrarily selected" as opposed to reflective of a change in her marital relationship with Robert. Hearing Tr., p. 433.

*Jennifer's Arguments*

{¶23} Jennifer offers two main arguments in support of the trial court's order. First, she argues that the trial court appropriately found that the December 2009 was the termination date of the marriage because that date was more appropriate than the November 2006 date advocated for by Robert. As noted above, the issue for the trial court to resolve was not which of the suggested dates was more appropriate, but rather what date, based on the consideration of the *Dill* factors, was equitable and reasonable based on the facts.

{¶24} Jennifer also contends that the parties had the same level of financial entanglement after November 2006, indicating that December 2009 was the appropriate de facto termination date. This contention has two significant

deficiencies. First, it is partly based on Jennifer's understanding of the issue as whether November 2006 or December 2009 was the appropriate termination date. As discussed above, this framing of the issue was improper.

{¶25} Second, Jennifer's contention has a tenuous basis in the record. Jennifer seizes on Robert's testimony that little changed financially between November 2006 and December 2006 as it related to the couple's finances. But, the record reveals that the parties' finances were not commingled after November 2006 to the extent suggested by Jennifer. While Robert did pay some bills that Jennifer incurred,[2] such as her car payment, she reimbursed him for those payments from her separate funds. Further, both paid their separate living expenses, including those relating to their separate residences, and used separate accounts. This is an entirely different arrangement from the one that existed before November 2006, that was described in the following testimony by Jennifer:

> Q:     And * * * both of your incomes, whatever they were, were going into the marital pot, correct?
>
> A:     Yes. Hearing Tr., p. 388.

In light of this evidence, we cannot agree with Jennifer's contention that the parties' financial affairs after November 2006 necessitated a de facto termination date of December 2009.

---

[2] We also note that Robert and Jennifer filed joint tax returns for the 2006 and 2007 tax years.

{¶26} In sum, the trial court did not properly engage in the analysis mandated by R.C. 3105.171(A)(2) for the setting of a de facto marriage termination date. Rather than focusing on the self-serving arguments of the parties and the temporal proximity of the divorce filing and the final hearing date, the trial court was required to focus on what de facto termination date was equitable based upon a consideration of the factors we announced in *Dill*. The trial court's failure to perform this analysis amounts to an abuse of discretion and we consequently remand this matter for the trial court to determine an equitable termination date that is properly based on the *Dill* factors and the evidence presented.

{¶27} Accordingly, we sustain Robert's first assignment of error.

*Robert's Second, Third, and Fourth Assignments of Error and
Jennifer's Cross-Assignments of Error*

{¶28} Since Robert's second, third, and fourth assignments of error, as well as Jennifer's first and second cross-assignments of error relate to the valuation and division of the marital assets and debts, our resolution of Robert's first assignment of error renders them moot. Accordingly, we decline to address them. *See* App.R. 12(A)(1)(c).

*Robert's Fifth Assignment of Error*

{¶29} In his fifth assignment of error, Robert contends that the trial court erred in requiring that he pay the full amount of money charged for the transcription of the proceedings in this matter. We agree.

{¶30} We preliminarily note that although Robert stylized his motion as a "motion to share expense of transcript," we treat it as a motion to tax the transcript as costs. Civ.R. 54(D) provides that "[e]xcept when express provision therefor is made either in statute or in these rules, costs shall be allowed to the prevailing party unless the court otherwise directs." We review a trial court's decision to assess a cost for an abuse of discretion. *Holmes Cty. Bd. of Commrs. v. McDowell*, 169 Ohio App.3d 120, 2006-Ohio-5017, ¶ 43 (5th Dist.).

{¶31} To determine whether an item should be taxed as a cost pursuant to Civ.R. 54(D), we engage in a two-part inquiry. "The first step of the inquiry is to determine whether an expense is an item properly taxable as a cost; this is followed by a decision as to whether the cost should be taxable in the particular case at bar." *Jones v. Pierson*, 2 Ohio App.3d 447 (8th Dist. 1981), paragraph one of the syllabus. In *Zittowksi v. Zittowski*, 70 Ohio App.3d 484 (11th Dist. 1990), the wife filed an objection to the magistrate's decision, which required that she file a transcript of the proceedings. The wife moved that the transcript cost be taxed as costs of the action, but the trial court denied her motion. The Court of Appeals, applying the *Jones* test above, reversed on the grounds "[t]he transcript was a necessary litigating expense and not a mere personal expense; it was neither an unusual nor unreasonable expense and, thus, the trial court abused its discretion in denying [the wife's motion]." *Id*. at 487; *see also Barran v. Kinas*, 8th Dist. No.

85085, 2005-Ohio-2002, ¶ 17 (reversing trial court's denial of motion to tax transcription fees as costs of action because transcript had to be filed along with objections to magistrate's decision).

{¶32} The same facts exist here since both Robert and Jennifer objected to the magistrate's decision, which required that they file the transcript of the proceedings before the magistrate. Civ.R. 53(D)(3)(b)(iii). Under *Zittowski*, the costs of the transcription were therefore necessary and recoverable as costs pursuant to Civ.R. 54(D). As a result, the trial court abused its discretion in denying Robert's motion and the cost of transcription should be taxed as costs of this action.

{¶33} Further, we note that significant inequity would occur if the parties did not share in the costs of the transcription. A review of the record reveals that both Robert and Jennifer objected to the magistrate's decision and requested the production of the transcript. Moreover, in her original set of objections, Jennifer "request[ed] leave of court to amend and supplement said objections once the transcript of the hearing is filed with the Court." (Docket No. 102, p. 8). Indeed, upon the transcript's filing, Jennifer filed supplemental objections to the magistrate's decision. Based on these filings, Jennifer benefitted from the production of the hearing transcript since it allowed her to object to the magistrate's decision and to file supplemental objections. It would be inequitable

for her to receive these benefits and yet not have to share in the costs simply because Robert was the first party to object and request the transcript.

{¶34} To support the trial court's denial of the cost sharing, Jennifer cites to Loc.R. 32 of the Court of Common Pleas of Shelby County. The rule provides that "[t]he compensation of reporters for making transcripts and copies shall be paid forthwith to the reporter by the party for whose benefit the same is made." Loc.R. 32 of the Court of Common Pleas of Shelby County, General Division. However, the record plainly reveals that the transcripts were made for both Robert's benefit and Jennifer's benefit since they both filed objections to the magistrate's decision. Consequently, Loc.R. 32 does not mandate that only Robert pay for the costs of transcription.

{¶35} Accordingly, we sustain Robert's fifth assignment of error.

{¶36} Having found error prejudicial to Robert in the particulars assigned and argued in Robert's first and fifth assignments of error, we reverse the trial court's judgment and remand this matter for further proceedings consistent with this opinion.

*Judgment Reversed*
*And Cause Remanded*

**WILLAMOWSKI and SHAW, J.J., concur.**

**/jlr**

-21-